F

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Ford Motor Credit Company, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>U.S. Leasing & Sales, Inc., a Minnesota corporation, and Loren Backlund,<br><br>Defendants. | Civil File No. 02-2925 JEL/JGL<br><br>SWORN STATEMENT OF RICHARD RILEY FRISBIE |

STATE OF VIRGINIA )
)ss.
COUNTY OF ___________ )

My name is Richard Riley Frisbie. I am making this statement of my own free will and volition. I have firsthand knowledge of all the facts set forth herein and, if called to testify, would testify as follows:

1. I began my career in the truck industry thirty-seven years ago working for Dodge Trucks as a management trainee. I have been continuously employed in the truck industry since that time. Although I changed employers over the years, I eventually worked my way up to executive management and sales positions for different manufacturers in the industry.

2. In October of 1999, I was hired by Bering Truck Corporation ("Bering") as Bering's Director of Market Representation. In approximately the spring of 2000, I was promoted to Bering Director of Sales and Market Representation. I held this executive position until Bering closed its doors in June of 2001.

3. One of my primary responsibilities as Bering Director of Sales and Market Representation was to recruit new dealers for Bering's U.S. operations. Bering instructed me that my assigned recruitment territory included the entire United States. As Bering Director of Sales and Market Representation, I recruited prospective dealers who were interested in the Bering line of trucks, parts and equipment, and introduced these dealers to the programs regularly offered by Bering to its dealers. Often times, I would recruit dealers of other lines of equipment that I knew from my dealings in the industry, and that I thought would represent the Bering line of trucks, parts and equipment well. Additionally, I responded to inquiries from dealers who solicited Bering for information pertaining to how to acquire a Bering dealership. It was my practice to personally visit any prospective dealer that I felt would make a good fit with the Bering organization.

4. Along with my recruitment efforts as Bering Director of Sales and Market Representation, I emphasized the benefits of certain special finance programs that Bering, in conjunction with its lender, Ford Motor Credit Company ("FMCC"), offered to its authorized dealers. The programs that I emphasized to these potential dealers were, for lack of more formal titles, the Initial Stock Order Program and the Mixer Program. It was my job to advise potential dealers of the nature of the programs during dealership negotiations, and to actually offer the terms of these special finance programs to dealers once they signed up to become a Bering dealer. A key part of my "sales pitch" to potential dealers was emphasizing that Bering was only able to offer the special finance programs due to the approval and support it received from FMCC with respect to the terms of the programs. The terms of these programs were oral; neither Bering nor FMCC required that the terms of the special finance programs be put into writing. Both the Initial Stock

Order Program and the Mixer Program were regularly employed by Bering at the time I joined Bering as Director of Sales and Market Representation in October of 1999.

5. The terms of the Initial Stock Order Program and the Mixer Program originated from the top executives at both Bering and FMCC. Some of the top executives involved in the development of the special finance programs included the following individuals: (a) Bering executives William Anderson, Michael Roach and Duncan Sellers; and (b) FMCC executive Harry Saxton.

6. Bering instructed me to advise interested dealers that, under the Initial Stock Order Program, Bering - in conjunction with FMCC and Primus, a subsidiary of FMCC - offered one full year of free financing on all floor-planned vehicles that were ordered by a dealer to satisfy the initial inventory levels required by Bering of its dealers. Generally, Bering advised its dealers to acquire an initial inventory ranging anywhere between sixteen and twenty-four machines, depending upon the size of the dealership. As Bering Director of Sales and Market Representation, I relayed these inventory requirements to prospective dealers both during the initial dealership negotiations, and again after the dealer had become an authorized Bering dealer. Based upon my experience in the industry, I can comfortably say that Bering's initial inventory requirement was relatively high compared to the recommended inventory levels of other truck and equipment manufacturers. Many dealers, including Loren Backlund of U.S. Leasing & Sales, indicated that the special finance programs were viewed as especially attractive incentives in light of Bering's high inventory requirements.

7. As Bering's representative (and FMCC's indirect representative), I informed interested dealers that, under the Initial Stock Order Program, Bering would directly pay FMCC

all interest due on the eligible floor-planned vehicles during the initial one-year free financing period. I also instructed these dealers that they would not be responsible for making payments to FMCC for interest that accrued on eligible vehicles during the initial one-year period. The Initial Stock Order Program covered only the smaller line of Bering vehicles, and did not apply to Bering mixers.

8. While serving as the Bering Director of Sales and Market Representation for the United States, I recruited and assisted Loren Backlund, and Mr. Backlund's corporation, U.S. Leasing & Sales, in becoming an authorized Bering dealer. I recruited Mr. Backlund largely due to his prior experience in the industry and the successes that he had previously achieved as a dealer of other equipment lines. I knew that he worked hard and would represent the Bering line well. During one of my personal visits to Mr. Backlund's dealership location in Rogers, Minnesota in early-2000, I informed him of Bering's initial inventory requirements and the terms of the Initial Stock Order Program. Mr. Backlund eventually decided to become a Bering dealer and take advantage of the Initial Stock Order Program offered by Bering.

9. Bering also instructed me to advise potential dealers that, under the Mixer Program, Bering offered participating dealers one full year of free financing on all floor-planned mixers ordered by the dealers, with the additional guarantee that, at the expiration of the initial one-year period, Bering would repurchase any mixer remaining unsold at the participating dealership. Again, under the Mixer Program, the participating dealers were not responsible for making payments to FMCC for interest accruing on the mixers during the initial one-year period.

10. Many dealers, including Loren Backlund, ordered mixers for their dealerships in reliance on the free financing and guaranteed buy-back terms of the Mixer Program. I am aware

that Bering failed to pay the interest due under the Mixer Program with respect to the mixers ordered by Loren Backlund, and failed to repurchase Mr. Backlund's mixers at the end of the initial one-year financing period. Additionally, out of all the mixers financed under the Mixer Program, I can recall only one instance where Bering actually repurchased a mixer from a dealer at the end of the financing period. Even in this one instance, however, I believe the dealer received only a portion of the amount due to it from Bering as reimbursement for the repurchased mixer!

11. The Mixer Program experienced other problems as well. I am aware of the fact that Bering, in conjunction with FMCC, charged certain dealers for floor-plan interest on mixers that were never delivered to the dealerships in the first place. For example, although Midwest Diesel in Minnesota financed only one mixer through FMCC, this dealer was charged floor-plan interest on two mixers up until the time that the discrepancy was discovered long after Bering ceased paying the interest due to FMCC under the special finance programs. I am also aware that a Pennsylvania dealer who floor-planned no more than two mixers through FMCC was charged interest on a total of four machines - two of which had not even left the U.S. port of entry at the time that Bering closed in June of 2001! Despite these discrepancies, FMCC continued to charge dealers for interest due on mixers that were not present at the dealerships until the dealers took a stand and demanded that the charges be corrected.

12. Additionally, I believe that the Mixer Program was a scheme developed by Bering and FMCC to quickly generate revenue for Bering, a financially-troubled organization. In my discussions with Bering engineer Bill Lukaczyk shortly after Bering closed its doors in June of 2001, I learned that certain Bering executives, including Michael Roach, intentionally saturated

the U.S. market with mixers that were not adequately tailored for the U.S. truck industry, despite having knowledge that the mixer specifications utilized did not, and would not, result in a competitive mixer for the U.S. market. These discussions revealed that the mixer specifications were left "as is" in an attempt to avoid any obstacles to Hyundai's formal acceptance of Bering as its U.S. distributor, and to generate immediate dealer interest in the product, saturate the market with Bering mixers, and start earning revenue for the Bering line. As a result of this intentional oversight, the mixers that were sold to Bering dealers at approximately $93,000 each were largely unpopular with the U.S. consumer, and remained unsold at Bering dealerships around the country. Bering eventually attempted to sell the mixers to both a Mexican distributorship as well as other Bering dealers directly at severely discounted prices as low as approximately $52,000 each, however, Bering experienced difficulty in selling the mixers even at the discounted rate. This problem was only compounded by the fact that Bering overwhelmingly failed to repurchase the mixers from the dealers that had financed them under the Mixer Program, and instead, left the dealers with unmarketable products on their lots that they were unable to sell at any reasonable price.

13. In the fall of 2000, it became common knowledge within the Bering organization that Bering had fallen behind on its financial obligations to Hyundai. In fact, I later learned that Hyundai terminated Bering as the U.S. Distributor of Hyundai trucks in or around November of 2000. Despite the fact that my responsibilities within the Bering organization were to recruit new Bering dealers, Bering never directly made the November 2000 Hyundai termination known to me at all prior to the time that it ceased operations in June of 2001. In fact, I first learned of the Hyundai termination *from Hyundai* in the summer of 2001 *after* Bering ceased operations! Rather,

from the fall of 2000 to the spring of 2001, Bering kept urging me to recruit new dealers to carry the Bering line of trucks, equipment and parts. In fact, Bering continued to urge me to recruit new dealers until the spring of 2001, when Bering finally went public with its weakening financial position. The Bering dealers were also kept in the dark on these important facts until the spring and summer of 2001.

14. Despite Bering's insistence on the recruitment of additional dealers, and knowing that Bering was struggling financially and was unable to adequately support its existing dealer network, I stopped actively recruiting new dealers in or around October of 2000. FMCC, however, continued to finance the dealers that Bering was able to secure prior to the time that Bering ceased operations in June of 2001.

15. Due to my former position with Bering as the Director of Sales and Market Representation, I am personally aware of the fact that Bering defaulted on its interest payment obligations under the Initial Stock Order Program and the Mixer Program to FMCC. Beginning in late-2000, I received calls from concerned dealers inquiring as to why Bering ceased making interest payments on behalf of participating dealers to FMCC. Loren Backlund was one of those concerned dealers who contacted me to inquire into the reasons behind Bering's conduct. In February or March of 2001, Bering notified all dealers participating in the special finance programs that the terms of the free financing offered by Bering were being unilaterally "revised" and that, as a result, individual participating dealers would be responsible directly to FMCC for any interest due on the floor-planned machines. I am aware that the dealers, through their dealer council, overwhelmingly rejected this "revision."

16. Also, beginning in September of 2000 and continuing until the time that Bering

ceased operations in June of 2001, Bering failed to provide warranty reimbursement, sales allowances and sales commissions that were due to its dealers. Although I tried to work with Bering to provide the dealers with at least some of the money due to them on many occasions, the Bering executives generally weren't willing to budge. I was told by my superiors - including William Anderson, Mike Roach, Duncan Seller and Steve Shallcross - that Bering just did not have the funds to pay the dealers the amounts that were due to them.

17. Bering attempted to change the terms of the special finance programs offered to its dealers, at the insistence of FMCC, because of the fact that Bering was behind on its financial obligations to FMCC, and more importantly, because FMCC began to demand that Bering keep its dealer accounts current. Under the terms of the revised finance programs, Bering advised the dealers that they would be obligated directly to pay FMCC any interest due on the floor-planned vehicles, and then seek reimbursement from Bering for the interest paid to FMCC at a later date. Many dealers, including Loren Backlund, complained to me after learning of this change in payment terms under both of the special finance programs because they knew that, due to Bering's previous failures to pay the dealers for amounts owed to them, Bering would not be able to reimburse the dealers for the interest paid by the dealers to FMCC.

18. Bering ceased operations in June of 2001. As a result, existing Bering dealers across the country were left to fend for themselves, without any further support from Bering.

19. After Bering ceased operations in June of 2001, I was hired on a contract-basis by FMCC to locate the remaining Bering collateral for FMCC. I worked for FMCC from approximately June of 2001 into September of 2001, until Harry Saxton of FMCC was able to hire another individual to fill the position on a more permanent basis. Although FMCC never actually

admitted to me that, after Bering closed in June of 2001, it took over the role of Bering with respect to the dealership network, FMCC did, in fact, act as the manufacturer in certain instances. For example, in one instance, FMCC repaired certain non-operational trucks that a Bering customer in the Shenandoah Valley had purchased directly from Bering for roughly $260,000 shortly before June of 2001, through a last-minute deal brokered by Michael Roach. At the insistence of the customer, I urged FMCC to fix the customer's trucks, which FMCC did in fact do after June of 2001.

20. I am also aware that, over the past year or so, FMCC has attempted to sell the Bering mixers that it acquired as collateral, after Bering ceased operations in June of 2001, to former Bering dealers and other interested parties at severely discounted prices. I am aware that FMCC has engaged in this conduct despite the fact that it has continually refused the requests from many Bering dealers to allow the dealers to sell the mixers to customers at equally-competitive prices in order to satisfy the financing debt to FMCC and stop the accrual of interest on the machines, saying only that the mixers were floor-planned at the original, higher prices of $93,000.

21. Based upon my extensive experience in the truck industry, which includes nearly two years' experience in serving as Bering's Director of Sales and Market Representation, and my familiarity with the special finance programs regularly offered to dealers by Bering, it is my opinion that Bering failed to live up to the terms of the programs that it regularly offered to its dealers. It is also my opinion that FMCC played an integral role in both the development and the subsequent attempted restructuring of the finance programs offered by Bering and FMCC, as well as acquiesced to Bering's conduct in recruiting and financing new Bering dealers through these programs even in the face of Bering's severe financial troubles.

22. The statements set forth herein are true and correct to the best of my firsthand knowledge, information and belief.

Richard R. Frisbie

STATE OF Virginia )
)ss.
COUNTY OF Fairfax )

On this 15 day of January ~~2002~~ 2003, Mr. Richard R. Frisbie appeared before me and, after first being duly sworn, stated that all of the matters set forth in this statement are true and correct too the best of his firsthand knowledge, information and belief.

Notary Public
My Commission Expires March 31, 2006